GARRETT *v*. PYRAMID LIFE INS. COMPANY.

4-5267                                            121 S. W. 2d 898

Opinion delivered November 28, 1938.

*Talley & Talley* and *Wayne W. Owen*, for appellant.
*Verne McMillen*, for appellee.

SMITH, J.   Mrs. Lizzie Garrett, hereinafter referred to as appellant, brought suit on May 5, 1937, against the Pyramid Life Insurance Company, hereinafter referred to as appellee, to collect a policy of insurance issued by appellee, under date of September 30, 1935, on the life of Tome J. Garrett, her son, in which she was named as beneficiary.   The insured was killed September 12, 1936.

In response to a motion to make the complaint more definite and certain, the court, on September 24, 1937, sustained a motion to require appellant to state the date of premium payments, to whom paid, and to set out the receipts for the payments made.   On April 15, 1938, appellant stated, in answer to this order of the court, that a premium payment, amounting to $22.82, was made by the insured, Tome J. Garrett, on the ............ day of October, 1935, and that the payment was made to appellee's general agent, Kenneth S. L. Cooke, and a receipt given therefor.   Appellee filed an answer, alleging that only one premium payment had been made, that being a payment for a quarter of the year, and that the policy had lapsed on account of nonpayment of other required premiums.

Practically no attempt was made to prove a premium payment in the amount and manner alleged except

194

by the testimony of Ben Cockerill. This witness testified that the insured met Cooke, the agent, in Hot Springs, and paid Cooke the premium and took a receipt therefor. When asked, "Did the receipt say it was for balance on premium, for annual, semi-annual or quarterly?", he answered, "Annual," and that Cooke said "it was the annual premium for the year."

This testimony was in conflict with all the other testimony previously offered by appellee upon the question of the payment of premium, the other testimony being to the effect that the payments made were all quarterly premiums. This contradiction was qualified by Cockerill's answer "Yes" to the following question: "I believe you said this receipt stated 'the remaining part of the annual premium'?".

When the first testimony was offered conflicting with the allegations of the response to the motion to make definite and certain, the following colloquy occurred between the court and counsel for appellant: "Court: I know. We had this matter up in my office sometime ago. Mr. Talley, in your original complaint, there was no allegation as to the payment of this premium, and the court was of the opinion that the defendant should have some notice of what your contention was in that respect and granted defendant's motion to make the complaint more definite and certain, by setting up when these payments were made. Now, you did that by way of an amendment and response to the motion. Now, let me see your response. You allege in here that the premium was paid by the insured, Tom Garrett, in the amount of $22.80, and that the premium was paid sometime in October. Now, your proof would be confined to that allegation. Mr. Talley: At this time I want to amend the complaint to include that the premiums were paid in the month of October, 1935, as set out in the amended complaint, as well as of July 30, or in July or August, 1936. It is a universal rule that you can amend. Court: It might be if it was the first time the matter was called to the attention of the attorneys, but we spent considerable time in trying to get the issues in this case in such condition that both parties could be ready for trial today.

Now, when you come up and allege a different method of payment, then the defendant is not put upon notice. What is he expected to meet by way of proof?"

However, the court permitted testimony to be offered that the premiums had been paid quarterly, and upon that issue the following testimony was heard.

Edward W. Garrett, a brother of the insured and a son of the beneficiary, testified that he knew that his mother paid two premiums. He did not recollect whether they were quarterly premiums, but it "seemed to me like the first one was two dollars and something," and he did not recollect the amount of the second payment, but he had seen four different receipts. He identified a receipt offered in evidence dated October 10, 1935, for $3. Another receipt was offered in evidence dated February 11, 1936, for $2. And, when asked, "Did she (Mrs. Garrett) make any payments other than these, or was that the extent of her payments?" answered, "I don't think she did." He was further interrogated as follows: "Q. Did you state that later, other payments were made to Mr. Cook? A. Yes. Q. Where was that? A. I don't exactly know, but I think it was made in the CCC camp. Q. How do you know? Were you there at the time? A. No. Q. Then you couldn't testify to that? A. He came home with a receipt in his pocket. Q. Do you remember the dates on the receipts that you saw after these two—the dates of them? A. No. My mother took care of all that and I never paid much attention to it. Q. What was the amount of the receipts? A. Those two? Q. No, the other one you saw; what was the amount of it? A. I think it was $6. Q. You stated one of these subsequent receipts was for $6. What were the others for? You stated you saw two other receipts, didn't you? A. No, I just only saw one. Q. About when was the date you saw this last receipt that was paid; and for what period was that? A. The best I recollect, it was in July, but I am not sure about it. Q. Of what year? A. 1935. Q. You said 1935. This policy was issued in 1935. A. 1936, it was. Q. But you do know this: you know that premium was paid in July, 1936—that $6 premium, do you not? A. Yes, I saw that;

he had it in his pocket." When asked if he saw the date when the receipt was issued which he saw in July, the witness answered: "I don't recollect just exactly."

The witness Cockerill, above referred to, identified the time when he saw the receipt which he mentioned as being during the time he and the deceased were working in the CCC camp in July, 1935. In answer to repeated questions he was very definite that the time was in July, 1935, in fact, July 30, 1935. In a final attempt to have the witness place the date a year later, he was asked, on his redirect examination: "Q. Was it 1935 or 1936? Refresh your memory by something and give the date. A. It was 1935 when we were in camp. Q. You went into the CCC camp in 1935? A. Yes." The inquiry was not pursued further, and the witness was excused.

The widow of deceased testified that her husband paid as much as $5, and she didn't know how much more. Her husband went to the courthouse to make the payment to the agent, and she went with him, but did not go in the courthouse and did not see the payment made, but her husband had a receipt for $5, which he placed in his pocketbook, and after his death she kept it with her things, and it was still in the pocketbook the last time she saw it, but does not know where it now is, and she did not know who had signed the receipt and was not sure as to the amount receipted for.

The guardian of the insured's children testified that he took charge of deceased's effects and his papers, which were in a box, and "there was one receipt, I guess you would call it, for the money he had paid in, was all I know anything about." He testified that the receipt he saw in the box "was something similar to the receipt here."

The beneficiary testified that when the application for the policy was made she paid "a couple of dollars," and that, altogether, she made "two or three payments." When the policy was delivered she made the payment evidenced by the receipt dated October 10, 1935, above referred to, and that a receipt was given her for each payment made, and that when she made the last payment to Cooke she was told by him that this was the last pay-

ment she would have to make and the policy was in full force. The answer to this leading question was the word "Yes," but it does not state for what period of time the policy would be in full force. She was then interrogated as follows: "Q. Did he tell you that you would have to pay any more premiums on that policy-year? A. A year? Q. On that policy for a year? A. No, sir. Q. He said you wouldn't have to pay any more premium? A. Yes. Q. For the policy-year? A. I don't remember. You see, I didn't make any more payments, and it stopped at that. Q. Did he tell you it wouldn't be necessary to make any more payments? A. I don't know. Q. In other words, did he say the policy was paid up? A. Yes, he said that."

This witness testified that the first payment was made by note for the premium, and after a number of questions by her counsel, all more or less leading, in regard to this note, which elicited no definite information, the court said: "Q. Mrs. Garrett, if you remember the amount of the note, state it; but if you don't, just state you don't remember it. A. I don't remember the amount of the note." (Appellant's counsel): "Q. You don't know whether it amounted to $22.82 or $6.05, or what it was? A. No."

Upon the cross-examination of this witness she admitted that Cooke, appellee's agent, accompanied by R. W. Hendricks, came to her house to collect a premium, and she was asked if she told Cooke that her son, the insured, would not permit her to pay any more on the premium, and that she was not going to pay any additional premium, and that he (Cooke) need not come back any more. She answered: "I just told him I didn't want to pay it any more, but I didn't tell him any reasons."

Hendricks, who was called as a witness for appellant, testifying in regard to this visit, stated: "Mr. Cooke went up there and talked with her there and tried to get her to keep this policy on; and she wouldn't do it," and that appellant told Cooke that "her son objected to it, and she couldn't carry the policy any longer, that he wanted to build a new house."

Cooke was called as a witness for appellant, and he stated that he had severed his connection with appellee more than a year before, and that he wrote the policy, which carried an annual premium of $22.82, or $6.05 quarterly, that he made four visits to collect this premium, and that on one visit he was paid $3, which completed the payment of the premium for the first quarter, and that he was never able to collect more, and only $6.05 was ever paid by anyone on the premium.

Appellant was not recalled to deny the testimony of Hendricks.

We have stated the substance of the material testimony tending to show that premiums were paid which would have continued the policy in force until the date of the insured's death, and we think the trial court was fully justified in concluding that there was no substantial testimony to sustain that contention.

It is insisted, however, that appellee waived nonpayment by sending appellant a "Notice of Payment Due" reading as follows:

"Notice of Payment Due
"Pyramid Life Insurance Company
of Little Rock, Arkansas
"Home Office Statistical Information

"KS: Cooke                                        Ark.-S. A.

"No. 20306 Amt. 1,200 20 Pay Due on 30 Day of Sept. 1936.

"Notice of the Annual Premium—22.82 Life on the life of Mr. Tome J. Garrett % Mrs. Lizzie Garrett, Mt. Valley Route, Hot Springs, Arkansas.  22.80 Total.

"Please return this notice with your remittance. Notify the company of any change of address.

"Please remit direct to home office or branch office.

"Make all remittances payable to the company."

This contention may be disposed of by saying that the notice was received September 17, and the insured had died on the 12th, five days prior to its receipt. The complaint did not allege there had been a waiver, and the motion for a new trial is silent upon this question; indeed, the notice copied above does not appear to have been introduced to prove a waiver of the payment of

premium but, rather, to show that the premium had in fact been paid.

In the case of *Patterson* v. *Equitable Life Assurance Society,* 112 Ark. 171, 165 S. W. 454, it was said: "Furthermore, the death of Patterson fixed the rights of the parties to the insurance contract as they existed at that time, and any letter written by the appellee after Patterson's death, and without knowledge thereof, and addressed to him as though he were living, could not be considered as a waiver of appellee's rights under the insurance contract as they existed at the time of Patterson's death. At the time of the death of the insured, by reason of the nonpayment of the premium, the policy had lapsed, and he had been advised thereof, and only certain rights which involved affirmative action on his part remained to him, and of which he had not availed himself, and his death left only the right, by the very terms of the contract, to a paid-up policy of insurance for $900. The appellee, at the time of writing the letters, being ignorant of the death of Patterson, could not waive its rights fixed by his death, even if the letters would have otherwise constituted a waiver. There can be no such thing as a waiver of rights without knowledge of the facts upon which such rights are based." The case of *American Life Ass'n* v. *Vaden,* 164 Ark. 75, 261 S. W. 320, is to the same effect.

We conclude, therefore, that the trial court committed no error in directing the jury to return a verdict for appellee, and the judgment is affirmed.